Your honors, may it please the court. Regina Wang on behalf of the appellant, Dr. Leah Hollis. Ever since Morgan State University set Dr. Hollis' starting salary at the lowest pay on the departmental pay scale, it has allowed the pay disparity with male comparators to grow. MSU has offered at least four justifications that a jury could determine are pretextual. First, with respect to the initial pay disparity, MSU has offered justifications in litigation that it did not offer at the time of hiring. Second, MSU claims that her 2016 promotion application was untimely because her initial three-year term had not been renewed. But for the prior 16 months, over a dozen administrators and faculty at MSU had considered Dr. Hollis' application, and no one had suggested that it was untimely. Third, MSU criticizes Dr. Hollis' scholarship for being published in venues in which she was affiliated, but it praised Dr. Gawley for being affiliated with venues in which his work appeared. And finally, with respect to her promotion applications to full professor, MSU discounted her works in progress and reviews and work scholarship that she achieved prior to achieving tenure, even though it considered these qualifications both for Dr. Robinson and Dr. Gawley when it considered their promotions to full professor. Today, I will start with Dr. Hollis' wage discrimination claim, then move on to sex discrimination, and finally turn to retaliation. Is the – in your introduction there, does that cover – it seems like, just hearing it, it's focused on the employment – the paid claim generally and the employment decisions before the 19 and 20 decisions. Am I understanding – and I'm not suggesting you're waving that, but it seems like your introduction is focused on the earlier promotional decisions. No, so I actually – You didn't mention anything about, like, timeliness and exhaustion, but maybe you're going to get to that. Yeah, I'm going to get to that. I just mentioned the procedural things, but I did mention – the fourth thing I mentioned was on the merits of her promotion applications in 2019 and 20 to full professor. Okay. MSU discounted her works in progress and also prior work. Okay, all right. So starting with her wage discrimination claim under the Equal Pay Act, Dr. Hollis has established a prima facie case by showing that she was paid less than male competitors. The burden then shifted to MSU to show that a factor other than sex, in fact, explains the pay disparities. Why do we care if she has made a prima facie case or not at summary judgment? Why aren't we just looking to whether there's a genuine dispute of material fact about whether she's been discriminated against on the basis of pay? I mean, at summary judgment, does – I mean, if there's a ruling, we've got to review it. I understand that, but just as a – why are we talking about a prima facie case at summary judgment? Sorry, so, yeah, I guess the prima facie case isn't really disputed. The dispute here is really under the Equal Pay Act, the burden is on MSU to show that the factor other than sex explains the pay disparity. And so at summary judgment, MSU can only prevail if there is no dispute that MSU was, in fact, motivated by this factor other than sex. And here, Dr. Hollis has presented evidence from which a jury could determine that both the initial pay disparity was not, in fact, motivated by a factor other than sex and also that MSU allowed that pay disparity to persist and, in fact, even to grow, notwithstanding Dr. Hollis' strong performance. So with respect to the initial pay disparity, MSU points to the qualifications of each candidate at the time of hiring. And, for example, for Dr. Ghali, MSU claims that now, in litigation, that he had better community college experience. But this was not the justification they offered at the time of hiring. So a jury could question whether this really was the factor that drove MSU's decision when they set his salary at a higher salary than that of Dr. Hollis. Dr. Ghali had just finished his doctorate when he was hired at MSU as a lecturer, and then MSU immediately decided they would hire him as an assistant professor at a salary that was $5,000 higher than the starting salary for Dr. Hollis. Taking another comparative example, Dr. Davis. MSU considers the fact that he had community college administrative experience in leadership roles at a community college, but that was not a criteria that was listed in the job posting. So a jury could disbelieve that that was really a reason why his initial higher salary was justified. Is that right? That if you don't list a factor in a job posting, you can't rely on it as a basis for a different salary in litigation? You hold people to that? No, that's not necessarily true. But there is enough evidence here where a jury could disbelieve that MSU was really motivated for each of these male comparators by the factors that they're now offering. But you're not saying you necessarily get to a jury every time you can point to a distinction between a justification offered in litigation and a job listing, or a resume for that matter. Yes. It comes up in that context also. Yes, that's correct. And to the extent we think, for example, that it would be hard for a jury to determine qualifications at the time of hiring, MSU further allowed the pay gap to grow during the time that Dr. Hollis was at MSU. For example, in her first five years, her salary increased by less than $7,000, even though she was promoted in that time. And Dr. Davis was not even promoted in that time. He remained an assistant professor, yet his salary increased by over $10,000. So even if the initial pay disparity is maybe something hard for a jury to determine, at the very least, MSU impermissibly allowed the pay gap to grow, or at least a jury could so determine. If there are no further questions about the Equal Pay Act claim, I will move to the sex discrimination claims. So I'll start with the decision to deny her promotion application in 2016. MSU has offered two justifications for why her promotion application was denied, and that alone could lead a jury to determine that these justifications are both pretextual. One justification that initially offered was that her qualifications were insufficient, and then later, 16 months later specifically, for the first time ever, MSU suggested that, in fact, she had not been renewed for a second three-year term, and this was partway through her second three-year term that they made this discovery, and then claimed because of that, her promotion application was untimely, and therefore would not even consider the merits of her appeal. Counsel, am I right that on the 2016 promotional claim, the district court found that there had not been a prima facie case established? Yeah, so that was – the parties both disputed the prima facie case and pretext. So the disputed factor on the prima facie case was whether she had presented evidence to raise an inference of discrimination. This kind of goes back to what I asked you on the other claim is who cares? I mean, prima facie case is a lower standard than summary judgment. We're at summary judgment. Our question, shouldn't it be whether there's a genuine dispute of material fact about discrimination in promotion on the basis of sex? And it seems like there's a debate about the prima facie case. We're probably partly responsible for that. But at summary judgment, should we – is that even relevant? I guess the case law isn't super clear on which stage you should consider all this evidence, but the same evidence goes both to her prima facie case and to whether their justification is correct. The same arguments you would make – you're making about that, you would make about whether we were just dealing with the basic summary judgment standard, right? Yes, yes. And so here – Is there another issue? As I read the district court's order, it looked first at direct evidence and said it didn't find there was a genuine dispute of material fact. That was mainly the Laboon affidavit. Yes. And then it said – no, just to be a general fact – then it turned and said I'm going to do McDonnell-Douglas on circumstantial evidence. Yes. And looked at that. Yes. As if those were two forms of evidence that didn't – that you couldn't consider together. Yes. I mean, at summary judgment, can't you consider direct and circumstantial and see whether combined all the evidence creates a genuine dispute of material fact? Yes, that's precisely right. And we think all that evidence together is sufficient to survive summary judgment. For example, the Laboon affidavit may not be sufficient to be direct evidence, but it certainly is evidence that can be considered as indirect evidence together with the other evidence from which a jury could determine that MSU's justifications were a pretext for sex discrimination. Why wouldn't the affidavit of her supervisor saying I'm never going to promote her be direct evidence of discrimination? So she was not the final decision maker here, but she was – I know, but she was her immediate – Yes, and she was someone in a position to influence the outcome. And so that – Are you backing off that that's direct evidence of direct? We're using it as indirect evidence only because there's so much other evidence as well that we think this court should consider holistically rather than just considering that one piece of evidence. So here there's the fact that male comparators were promoted when Dr. Hollis was not. There's also the fact that MSU has offered different justifications at different times, and also the fact that there were procedural irregularities in the treatment of her promotion application, both at the initial stage and also on appeal. And all of this could together lead a jury to determine that MSU's justifications are all just pretextual, and this is actually all motivated by sex discrimination. So something that I mentioned in my opening that is relevant to both her 2016 promotion application and her 2019 and 2020 promotion applications is that while universities are certainly free to choose the criteria on which they judge various candidates, they must apply those criteria consistently, and here there's evidence that MSU has offered justifications that it did not apply consistently across male and female candidates. For example, Dr. Hollis was strongly criticized for her research and specifically for the fact that she had self-published works and also that she had works that were published in venues with which she was affiliated. But, for example, Dr. Robinson also had self-published works, and Dr. Ghali also was affiliated with various journals in which he published his work, and yet both of them were granted promotion every time they applied for promotion. In fact, if you look at the JA starting from, I think, page JA 1865 onward, where it shows the promotions from 2016 to 2021, MSU has never denied a male applicant in the department's application for promotion. It has only ever denied or deferred applications by female applicants, and this is something a jury could consider in determining whether, when it denied and deferred Dr. Hollis' promotion applications, this was actually motivated by sex discrimination rather than by the shifting justifications it now offers. And then also turning to her applications in 2019 and 2020, something else that I mentioned in my opening is that Dr. Hollis was criticized or her works that were in progress or that were achieved prior to achieving tenure, MSU seemed to discount when it was deciding whether she should be promoted to full professor. But when, for example, Dr. Robinson applied to full professor, he barely had any publications since he was granted tenure or teaching reviews, and MSU just considered all of his qualifications that he had achieved prior to achieving tenure in determining whether he should be granted promotion to full professor. Counsel, the district court didn't reach the 2019 and 2020 sex discrimination claims on the merits, right? Can I ask you a question about that? So the district court applied Title VII procedural bars to those two claims, but your client was also suing under Title IX in Maryland law in 1983, same sex discrimination claim in 19 and 20. What happened to those claims? Because those don't have the procedural bars. Yes. So this court, even if it determines that one of those procedural bars applies, that doesn't apply to any of those claims. Right. So what is your understanding of what the district court did with those claims? The district court considered them on the merits. Oh, so you mean the related claims? Yeah. I guess the district court just decided they were all going to get thrown out because there was this procedural bar on the Title VII claims. So you think the district court believed that if you want to file a 1983 claim, you have to wait 90 days after you get your right to sue letter from... I mean, the district court thought that these procedural bars applied to a 1983 claim? Yeah. So the district court seemed to apply it across all the claims that were related to those same sex discrimination claims. But for example, like the timeliness defense, MSU has only raised that with respect to her application for promotion in 2019. So that defense does not affect her wage discrimination claims or her promotion... Right. I'm just trying to figure out one of two things happened here. Either the district court made a colossal error and believed that if you're filing suit under Section 1983, you have to get a right to sue letter from someone and then file within 90 days, or the district court just kind of spaced on three of the claims in this case. Do you have a sense of which of those two things happened here? It seems to have been the latter. Just there were so many claims brought that they probably just lumped them all together. But on those procedural defenses, as I mentioned, they only really focus on specific claims. So for her promotion application in 2019, they've raised a defense that that claim was not timely. And with respect to 2020, they've argued that that claim was not exhausted, and we've explained in our briefs why both of those things are not true. Her 2019 claim was timely because it relates back to her original complaint, and her 2020 claim was exhausted because it was reasonably related to the two EEOC charges that she brought. Can I ask you a quick question about that? Assume for a minute the district court was right and the 2019 claim was not timely. Yes. So the 2019 EEOC charge kind of washes out. Yes. If you're trying to relate back now- That doesn't say the 2019 EEOC charge- She wasn't finished with her question.  So if you're trying to argue that the 2020 claim is reasonably related to the 2019 claim, I think it has to be- you think you can make that argument even if the 2019 claim was not timely. It would still be sufficient to show that to save the 2020 claim, that that one was reasonably related to the 2019 charge. Yes. So there's the 2019 claim and there's a 2019 charge. I know. I understand. Yeah. And so the reasonably related is just to the 2019 charge, and whether the 2019 claim is timely or not doesn't affect the underlying 2019 EEOC charge. I think it has to be related to an EEOC charge that was the proper basis for subsequent litigation. It's the way we framed it, and I can't remember the name of the decision, but the decision you cite. We say, no, no, it's okay as long as it is related to an EEOC charge that was the proper basis for subsequent litigation. So I have a slight concern here that actually your two claims are tied together, that they're going to rise or fall together, which might be fine, because you think you're going to win on both anyway. Yeah. I mean, we think we do win on both, but no one has suggested that the 2019 EEOC charge is no longer proper to consider just because she did not timely amend her 2019 claim. So even if you were determined that the 2019 claim could not be reasonably amended, that doesn't mean the 2019 charge just disappears. All right. Thank you. You have some time. We'll hear from Ms. Watkins now. May it please the court. Courtney Watkins on behalf of the appellees, Morgan State University, and the individual administrators that were the defendants in the underlying case. Appellees are here today to ask this court to affirm the decision of the district court granting summary judgment to the appellees on all counts against the defendants, the appellees in this instance. Beginning with the sex discrimination claims, specifically the lower court had found that the 2019 to 2020 claims were untimely because they were brought 140 days after that right to sue notice. Can I ask you the same question I asked your colleagues? Yes, absolutely. What about the Title IX, the 1983, and the Maryland law claims? Your Honor, candidly, it was an issue that was not raised at the lower level, and it doesn't seem like it was specifically addressed. I don't think that there's anything in the opinion to suggest that the decisions regarding the 2019 to 2020 to 2021 denials of promotion and tenure were based off of a merit argument because the courts merrily dismissed them based off the procedural grounds. I don't think it was an issue that was addressed. But to your Honor's point earlier, if this court determines that that 2000... So do you think those claims are still out there, or were they, or was summary judgment awarded on these other three? Your Honor, I believe summary judgment was ordered on those claims as well, and I guess if... But there was no analysis done for the summary judgment grant. Is that what you're saying? Yes, Your Honor. I will tell you, just my concern, I don't want to hide the ball or anything, is we do have case law saying that even where the district court thinks it has addressed all the claims, if it didn't address some of them, then we don't have a final order. Yes, Your Honor. I was thinking the same thing a moment ago, whereas if it's a situation where not all of the claims were addressed in the underlying decision, then technically it's a jurisdictional issue as to whether this is right for appeal at this moment. But it's interesting order to try to discern what happened. There's a footnote that says you treat those related claims like Title VII. And to an extent that's true on the merits, but as has been pointed out, some of the procedural requirements don't apply. There's no discussion of that, but it seems to dismiss... It doesn't say claim. It's plural each time. So maybe... What's your position? You said you were thinking that. I mean, do you have a position as to whether it is a final order or it's not a final order? Your Honor, I do believe it is a final order. Ultimately, even though it wasn't specifically addressed, the claims were decided in their entirety, whether it was based off the meritorious reasons that were argued by both parties or, in this instance, the procedural grounds. I think ultimately there was a final order. Whether there was the factual basis or the legal basis for the other elements is not as clear, I would say. Okay. But addressing the other issue that was raised, if this Court finds that that 2019-2020 claim was untimely, then by this Court's precedent in Jones v. Calvert group, the claim from the 2020-2021 promotion cannot then serve or relate back to the investigation that was done by the EEOC because the retaliation claim has to relate back to a charge that's properly before the Court in the first place. So because that 140 days had passed and the charge wasn't timely, and because that 2020-2021 decision was never actually exhausted in the EEOC with respect to that Title VII claim, the Court properly dismissed the Title VII claims with respect to the 2019-2020 promotion. Now, in terms of focusing on that 2016-2017 promotion cycle, the affidavit that's been referenced substantially in this case, the affidavit of Steve Laboon, is a factual issue in that it was an occurrence that allegedly happened soon after Steve Laboon joined the university when he was a new student, before he attended classes where the dean purportedly made, or excuse me, the department chair had purportedly made these discriminatory marks in front of him. We're not saying that that is not a factual issue. It is. But there has been a period of two years between when those remarks were allegedly made and when the promotion decision was first made in 2016 with that 2016-2017 application. What's the big deal in two years? When she was hired, the affidavit says her supervisor says she's never going to get a promotion. First time promotion comes up, she doesn't get it. Your Honor, I think that there is a difference between the facts of this case and the facts cited in the case by appellant, which is that Wanamaker-Amos case. Maybe different facts. I'm just saying, why couldn't a jury say? Look, I have no idea if what was in that affidavit is true or not. But there's an affidavit that the supervisor of Ms. Hollis said, you're never going to get a promotion here. I mean, I'm restricting pay for discriminatory reasons. And again, juries may say that. I'm not going to consider that for a bunch of credibility-related reasons. But, I mean, how does that not create a question of fact on at least everything besides retaliation here? Well, Your Honor, because in every single level of review, Dr. Prime, who's the person that purportedly made these statements, was neither the first nor the last person to call into question the credentials of the applicant, Dr. Hollis. So if there's other people who say something, the supervisor's discriminatory remarks should just be cast aside, jury doesn't get to consider them? Your Honor, when there's the period of two years that passed between when those remarks were allegedly made and when the decisions were made, when Dr. Prime was not even the initial person to recommend against promotion, she was highly criticized, Dr. Hollis, by Dr. Whitney Johnson. And there's been absolutely no evidence of any discriminatory animus on Ms. Johnson's part. And ultimately, the school committee that reviewed her application in 2016-2017 after that all uniformly made the determination that Dr. Hollis was not qualified for promotion and tenure at that point. Why isn't that a just fabulous jury argument? Well, Your Honor, I also think the fact that there were intervening acts in between when the remarks were purportedly made in 2016, I'm sorry, in 2014, and when the decision to deny promotion happened in 2017, like Dr. Prime giving Dr. Hollis a positive review from her first year, saying that she showed progress in all of the categories. And even in March of 2016, Dr. Prime and Dr. Hollis had a conversation where Dr. Prime had indicated that Dr. Hollis could apply for promotion and tenure at that point because of the number of publications that Dr. Hollis had at that time. Prime's issue that she eventually discovered when she reviewed the application wasn't that Dr. Hollis' number of publications was too low. It was that the quality of the actual publications was not sufficient to earn that coveted role of tenure and promotion in this institution. So putting aside the promotions, what about the unequal pay claim? I mean, she set the pay, right? And she set the pay around the time she allegedly made those discriminatory remarks, right? She set the pay prior to allegedly making those discriminatory remarks within a similar time frame. The remarks were around the time she started working, right? The remarks were August and September of 2014, allegedly. She had recommended her salary in February of 2014. So it was six months prior to the statements allegedly made. So you're thinking that six months is enough that we don't consider it at all in the pay claim? Well, Your Honor, I think with respect to the pay claim, when you're looking at the qualifications of the different folks that were offered up for the pay that they received, it's not a situation where the qualifications are similar. These people had significantly more community college experience. They're making more, materially more, all of them. And you have a statement from the person who sets her pay that is discriminatory about how she's going to be paid. I mean, if I was a plaintiff, I mean, I don't know if that's – how is that not a question of fact? Well, Your Honor, I think that in this case there was the issue about the separation in time between when that statement was made and when it was subsequently – sorry, when the pay determination was made and then when she was subsequently – when Dr. Prime subsequently allegedly made that statement. I think the other issue is that in this specific case – I just don't see why the – maybe I'm – and I'll be quiet. I know I'm taking up time. But it seems like the time – when the statement is a kind of categorical statement that I'm going to act in a way that's discriminatory about your workplace and a jury could say that's how I'm going to treat you while you work here, the fact that it might not be right at the time the pay decision was made just seems, you know, maybe a factor, but certainly not a conclusive factor. I think the statement is also significantly undercut by the fact that Dr. Prime recommended significantly higher salaries for other female professors that started – We usually don't talk about undercutting and stuff like that at summary judgment. Your Honor, I think in this case when it's a statement that happened six months prior, the decision ultimately was made to set her salary at the $60,000 amount and under the EPA the four categories include that factor other than sex. When we're looking at the actual qualifications of the candidate, they were far and above what Dr. Hollis was presenting at the time that she applied for promotion and tenure. At that time she was a non-tenured administrative or faculty member at for-profit universities. She didn't have community college outside of the one year at the Community College of Philadelphia, and that specific experience was not the level of involvement with the students that the other professors had demonstrated. For example, Dr. Russell Davis had served as the president of a community college for three years. He had served as a vice president for four years before that. He had significant experience in other community college-related positions, and although appellant in this instance has tried to diminish that experience by saying that he had earned that experience through falsified credentials, there's absolutely nothing in the record to suggest that any of that information was available or considered by the university at the time that they made the salary determination. The other comparators that are used in this instance include Dr. Ghali, who at that point had the primary assignment with the Community College Leadership Program, and he also had a contractual position in the Department of Advanced Studies as a lecturer and was joining since contributing to that department. So he had experience within the department already at that point, and then the subsequent situations where the pay disparity increase was purely a matter of the COLA increases or the merit-based increases that were by and large went out to the entire department, or in some instances where a person had earned tenure in promotion or promotion to full professor, in the case of Chris Robinson, or later Dr. Ghali, in those instances the determination was made by several levels of the school that Dr. Hollis did not possess the qualifications to be promoted to full professor. She was promoted in 2018 to 2019 to the associate professor position, and she was granted tenure, but following that promotion, she didn't demonstrate the level of research or teaching or general philosophy required in order to receive that designation of full professor. In those specific instances, those 2019 and 2020 promotion cycles in 2020 and 2021, Dr. Hollis was not the first, second, third, fourth, fifth, sixth, seventh, eighth person to review the candidate in that case. Instead, the entire departmental committee in both instances recommended against promotion in that 2019 and 2020 to 2021 cycle, and the school committee, by a majority, had also recommended against granting promotion in those instances. Dr. Prime had transitioned to be the dean of the school at that point, so it wasn't until all of the lower decision-makers had already made the determination that Dr. Hollis was not qualified at that stage to receive promotion and tenure. It's only at that point that Dean Prime had agreed with the prior assessments. Even looking back at that 2016 to 2017 time period where Dr. Prime was second in line after the three departmental committee members that reviewed the application first, ultimately, Dr. Prime actually gave a more favorable evaluation of Dr. Hollis than Dr. Whitney Johnson did at that first level. Dr. Whitney Johnson had rated her lower in service, whereas Dr. Prime had given Dr. Hollis a rating of excellent in service. They both had found that her research was unsatisfactory, because in this case, Dr. Hollis had focused on the quantity of the research as opposed to the quality. Even included in her dossier that she submitted for that 2016 to 2017 application was that letter from the editor that said that you needed to do substantial revisions, you needed to make substantial revisions to this journal article before it could be published, and there was questions about the methodology used as well. Am I remembering right, though, that this is the one where in the end the promotion was denied because it was late? Yes, Your Honor. That's a little weird, right? So, sorry. I'm sorry, Your Honor, if you want to just respond to my thought that it seems a little weird that all of a sudden after months and months and months of this, it turns out actually it was late all along, but maybe not. So, Your Honor, in this circumstance, the initial promotion was reviewed on its merit basis. So the first departmental committee had made the determination 2 to 1 to recommend 4 promotion. Dean Prime agreed with the chair of that departmental committee, Dr. Whitney Johnson, and said, you know, I don't think that the research is sufficient at this point. It went to the school committee. The school committee said 5 to 0. We agree that she is not ready for tenure and promotion at this point. Ultimately, the school gave her the opportunity to defer by one year, and after that offer was made, Dr. David Wilson, the president of the university, made the same offer. He said, you can apply next year. If you don't apply by next year, your employment with the university is finished. At that point, the appeal had occurred, and during that appeal process, more members looked at the occurrences that happened during this application, and they said, you know what, there were no issues with how it was handled at the lower level, but ultimately when this appeal was happening, because there were a lot of communications back and forth, even though the appeals committee recommended that the promotion be denied because there were no irregularities, ultimately the school at that point had determined there was another issue that we didn't catch before, and yes, it would have been great for them to have seen it on the front end, but ultimately, just because it wasn't addressed on the front end doesn't mean... And the review committee, there's a lot of pieces here, but that's also the committee that said, we know you didn't get a letter reappointing you, but you should have. Is that the same committee? Yes, Your Honor. Okay, so there are some irregularities here, it's fair to say. Your Honor, I think that the irregularities have to be tied to a discriminatory... I'm just saying there were some irregularities. Sure, Your Honor. There were some issues where the procedure wasn't followed perfectly, but when we're looking at how the procedure was carried out, we have to consider whether the irregularities were in any way related to any discriminatory animus. Here, all we have is the statement from Dr. Prime, but all of these irregularities or departures from the procedure that appellant has pointed out have been from other parts of the procedure process. Okay, and then suddenly, I just want to make sure, because you're running out of time, now she's an at-will employee? Yes, Your Honor. That's also irregular too, right? Very briefly, she was an at-will employee. The university immediately said, but we'd like for you to now apply for that second three-year term, and as soon as that application was fully submitted, because she did go on a period of leave, as soon as the application was submitted, it was accepted and she was given that second year. Okay, I just want to ask you about the at-will employee thing. That comes three months after her EEO complaints, right? She suddenly turns into an at-will employee? Yes, Your Honor. Okay. How is this not a jury question on retaliation? Three months after she complains, all of a sudden she's made an at-will employee for reasons that seem to be a little bit irregular. How does a jury not get to consider whether the fact that she is made an at-will employee and apparently first time ever might be related to those complaints? Your Honor, I think that because of the temporal proximity, the distance between I agree that it's on the edge for an inference, but we have cases at three months, and it's not just the three months when she becomes an at-will employee. I think it's like days afterwards, suddenly, this appeal committee, where this has just been sitting with nothing happening, suddenly they kick into gear to deny the appeal. And I think a reasonable jury could say, yeah, that's the first preparatory step. If you're going to retaliate by making her an at-will employee, the first thing you need to do is, like, clear up this appeal. Your Honor, if I may briefly respond. I do know I'm out of time. Go ahead. In this occurrence, the appeal committee was on summer vacation. It was dealt with in September, early September of 2017. A couple weeks prior, Dean Gibson had sent Dr. Hollis a notice that this committee was going to be assembled. And at that point, the school already had noticed that Dr. Hollis was bringing allegations against the school because earlier as a part of her appeal, when she first submitted that letter in May of 2017, she had already raised these issues. It wasn't a new occurrence or a new thought at that point. She had already made those allegations. Okay. All right. One question. I'm sorry. You haven't been arguing this way, and I appreciate it, but the district court ruled at summary judgment on the 2016 claim that it failed to . . . that there was a failure at the prima facie case. Your briefing and your argument today seems less prima facie-ish and more about whether or not you think there's a genuine disputed material fact on the basic statutory requirement of discrimination. Do you agree that prima facie really doesn't have anything to do with a summary judgment decision that we should . . . that that's irrelevant once you get to summary judgment? Your Honor, my understanding is that the prima facie case is relevant at the summary judgment standard. It's just that the ultimate question still has to be answered under Title VII, whether it was a result of discrimination. So I think it's . . . from my understanding, it's a joint assessment between those two ideas. All right. I'm not . . . I appreciate that. Thank you. All right. I think we're at rest here as far as you're concerned. Thank you, Your Honors. And we have some rebuttal. You have four minutes, Ms. Wang. Thank you. I just have three quick points. First, on the additional claims that were dismissed with the merits of her 2019 and 2020 claims, we briefed her Section 1983 claims on page 54 of her opening brief, which are not subject to exhaustion, and we appealed from a final order, which may be erroneously final, but which clearly rejected all of her claims. So this court does have jurisdiction, although the district court may have erred in dismissing some of the claims. And then second, on Dr. Prime's statement, opposing counsel is now pointing to the fact that Dr. Prime provided a positive review from Dr. Hollis's initial first-year packet, but this only makes clear that Dr. Prime did, in fact, receive Dr. Hollis's first-year packet and apparently reacted favorably, and yet that is also the basis for them claiming that her application for promotion in 2016 was untimely because she apparently didn't submit applications to be renewed, but when she resubmitted those applications later, they then told her she had been renewed, and that was after they had already demoted her to at-will status. And third, opposing counsel raises here factual disputes about Dr. Hollis's qualifications, which alone is a reason why summary judgment is inappropriate, but even if these factual disputes would be something that is difficult for a jury to determine whether a professor is actually qualified for a role, there is certainly sufficient evidence for a jury to determine here that MSU's proffered justifications are pretextual given the procedural regularities, their shifting justifications, and the fact that female professors were the only candidates who were denied or deferred in promotion applications while all these male comparators were promoted. If there are no further questions, I would just ask the court to reverse and remand on each of Dr. Hollis's claims. All right, thank you. We'll come down and greet counsel and adjourn court for the day. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Stephanie D. Thacker, Pamela A. Harris, A. Marvin Quattlebaum Jr.